111 So.2d 126

Lloyd J. COBB

v.

The LOUISIANA BOARD OF
INSTITUTIONS et al.

No. 43632.

Dec. 15, 1958.

On Rehearing April 27, 1959.

Jack P. F. Gremillion, Atty. Gen., Harry Fuller, 2nd Asst. Atty. Gen., for defendant-appellants.

Breazeale, Sachse, Wilson & Hebert, Baton Rouge, for plaintiff-appellee.

PONDER, Justice.

The plaintiff brought suit against the Louisiana Board of Institutions and the State of Louisiana, under the provisions of Senate Bill No. 100 passed at the 1956 session of the legislature, for the sum of $50,000, interest, and costs, for the loss of twenty registered Aberdeen Angus breeding cows, wherein it was alleged that these cows met their death by consuming a liquid purchased from the Louisiana State Penitentiary. The defendants entered a plea to the jurisdiction of the court and exceptions of no right and no cause of action. These exceptions and plea were overruled and a judgment on the merits was rendered in favor of the plaintiff in the sum of $50,-000 and such costs as are specially allowed by law. The defendants have appealed.

We previously entertained a suit embracing this controversy and dismissed the suit because it was a suit against the state and the plaintiff had not been properly authorized to institute the suit. See 229 La. 1, 85 So.2d 10. Thereafter, Senate Bill No. 100 of 1956 was passed by the Senate and vetoed by the Governor. This bill was returned to the Senate but was never called or reconsidered.

Senate Bill No. 100 reads as follows:

"By: Mr. Folkes

"An Act

"To authorize Lloyd J. Cobb to file suit against the State of Louisiana through the Louisiana Board of Institutions upon a claim for damages arising from the death of his cattle alleged to have been caused by being fed material bought from the Louisiana Board of Institutions; to provide the method

for citing the State therein, designating the Court in which said suit may be instituted; waiving any prescriptions which may have accrued in favor of the State against said claim and providing for the payment of any judgment which may be rendered in said proposed suit.

"Section 1. Be it enacted by the Legislature of Louisiana: That Lloyd J. Cobb, a resident of Jefferson Parish, Louisiana, is hereby authorized to file suit against the State of Louisiana through the Louisiana Board of Institutions, or any of its successors, upon his claim for damages arising from the death of his cattle alleged to have been caused by being fed material bought by him from and delivered by the Louisiana State Penitentiary to him at his Marydale Farm on February 3rd and 4th, 1953.

"Section 2. That said suit may be instituted before the 19th Judicial District Court, in and for the Parish of East Baton Rouge, Louisiana, and the State of Louisiana may be served and cited in such suit through the Attorney General of the State of Louisiana.

"Section 3. Such suit may be filed within six (6) months after this Act becomes law and any prescription which may have accrued in favor of the State and against said claim is hereby waived.

"Section 4. If judgment is rendered in favor of claimant and against the State of Louisiana, it shall be paid out of the revolving fund established pursuant to [LSA–]R.S. 51:692.9, or by the Treasurer of the State of Louisiana, out of any funds belonging to the State, not otherwise appropriated.

\* \* \* \* \* \*

"Veto

"Approved: ——————

"June 28, 1956"

This act shows that it was vetoed by the Governor on June 28, 1956 and the following veto message appears on the bill:

"State of Louisiana
Executive Department
Baton Rouge, La.
June 28, 1956

"To the Honorable
the President and Members
of the Senate

"Gentlemen:

"I have vetoed, and return herewith my approval, the following bill, with my objections thereto, as follows:

"Senate Bill No. 100—By Mr. Folkes.

"An Act to authorize Lloyd J. Cobb to file suit against the State of Louisiana through the Louisiana Board of Institutions, etc.

"I have vetoed this bill for the reasons that the method of payment

is not certain and it may be necessary to pay the claim at a time when the revolving fund of the Louisiana State Penitentiary would be jeopardized. Heretofore, payments of judgments against the State had to be authorized and appropriated by the State Legislature, which procedure is not made certain or mandatory in this bill. Further, this bill does not set forth the amount to be sued for nor does it state with certainty the basis of said claim.

"Respectfully,

"Earl K. Long,

"Governor of Louisiana."

The defendants contend that Senate Bill No. 100 is unconstitutional for the reasons that it contains an appropriation of money which has been vetoed by the Governor. The defendants take the position that all bills for the appropriation of money under Article 3, Section 22 of the Constitution, LSA, must originate in the House of Representatives, and that the bill is contrary to the provisions of Article 4, Section 10 of the Constitution because it is contingent and does not call for a specific amount. Defendants take the further position that under Article 3, Section 35 of the Constitution any judgment for money rendered against the state cannot be satisfied except out of monies appropriated by the legislature for the purpose and that it violates Article 4, Section 9 of the Constitution which provides "all other appropriations shall be made by separate bills, each embracing but one object." Defendants contend that if the bill is held to be constitutional, it is without effect because of the veto of the Governor since it contains no severability clause.

Under the provisions of Article 3, Section 35 of the Constitution, as amended, whenever the legislature authorizes suit against the state, no judgment rendered for money against the state can be satisfied except out of monies appropriated for that purpose. An examination of the original petition filed in this suit reveals that the plaintiff asked for his claim to be paid out of the revolving fund or by the State Treasurer, out of funds belonging to the state not otherwise appropriated. One of the purposes of the revolving fund is to pay for the purchase of supplies, equipment, tools, etc. to be used in the administration of the Louisiana State Penitentiary. When the plaintiff made thr Louisiana Board of Institutions a party to the suit it would appear that the plaintiff desired to be paid out of the revolving fund because the penitentiary is engaged in the production and manufacture of articles, goods, wares and merchandise. Otherwise, we can see no reason why the Board of Institutions was made a party to the suit. This indicates that the plaintiff at the time the suit was filed intended

to collect the judgment out of the revolving fund or out of the State Treasury, or, in other words, he interpreted the act as containing an appropriation. Thereafter, he amended his petition and deleted from his prayer that part of it which asked for the judgment to be paid out of the revolving fund or by the Treasurer.

Under the provisions of Article 3, Section 22 of the Constitution, all bills appropriating money must originate in the House of Representatives. Counsel for the plaintiff in his argument before this Court admits that if Section 4 of Senate Bill No. 100 is in fact an appropriation, that it could not be law after it was vetoed by the Governor and without its origination in the House of Representatives, but he argued that the plaintiff has no intention of satisfying any judgment that might be obtained out of the revolving fund or the funds of the state without a specific appropriation which he will later seek if he is successful in the suit.

 Senate Bill No. 100 does not contain a severability clause and in order to uphold this bill insofar as it grants a right to sue the state, Section 4 of the bill would have to be separated from the bill. The plaintiff cannot by merely agreeing not to enforce Section 4 of the bill make the bill effective.

 In a Supreme Court of the United States case, Carter v. Carter Coal Co., 298 U.S. 238, 56 S.Ct. 855, 873, 80 L.Ed. 1160, the general rule in regard to the severability of a portion of an act was laid down thus:

"In the absence of such a provision, the presumption is that the Legislature intends an act to be effective as an entirety—that is to say, the rule is against the mutilation of a statute; and if any provision be unconstitutional, the presumption is that the remaining provisions fall with it. The effect of the statute is to reverse this presumption in favor of inseparability, and create the opposite one of separability. Under the nonstatutory rule, the burden is upon the supporter of the legislation to show the separability of the provisions involved. Under the statutory rule, the burden is shifted to the assailant to show their inseparability. But under either rule, the determination, in the end, is reached by applying the same test—namely, What was the intent of the lawmakers?"

This rule of construction was cited with approval by this Court in the case of State v. Baggott, 212 La. 795, 33 So.2d 523.

 We are not unaware that the legislature may authorize suit against the state, but when it contains matters that require approval of the Governor it evidences the intention of the legislature that the

act is to be effective or ineffective in its entirety.

 We are also aware of the fact that a statute may be valid in part and invalid in part if the two parts are not so intimately connected as to raise a presumption that the legislature would not have enacted the one without the other. State v. Cognevich, 124 La. 414, 50 So. 439; 26 A. & E. Enc. 595; City of Alexandria v. Hall, 171 La. 595, 131 So. 722; Ricks v. Department of State Civil Service, 200 La. 341, 8 So.2d 49; Conley v. City of Shreveport, 216 La. 78, 43 So.2d 223. If the unconstitutional portions of an act are so interrelated and connected with the constitutional parts that they cannot be separated without destroying the intention manifested by the legislature in passing the act, the entire act is void. Stewart v. Stanley, 199 La. 146, 5 So.2d 531; Ricks v. Close, 201 La. 242, 9 So.2d 534; Womack v. Varnado, 204 La. 1019, 16 So.2d 825.

We pointed out in the case of Calcasieu Long Leaf Lumber Co. v. Reid, 146 La. 77, 80, 83 So. 384, 385:

"Of course, there are cases where a statute may be valid in one respect and invalid in another. But they are cases where the two parts of the law are so distinct and separable that the court can conclude that the intention of the Legislature was that the valid provisions of the law should be enforced, without regard for the provisions declared invalid. If the objectionable and the unobjectionable provisions of a statute are not distinct and separable, to declare the one provision invalid and the other enforceable would be to substitute for the law as enacted one which the Legislature might not have been willing to enact."

See also Etchison Drilling Co. v. Flournoy, 131 La. 442, 59 So. 867. It was also pointed out in State ex rel. Chess & Wymond Co. of Louisiana v. Grace, 188 La. 129, 175 So. 825 that if the Legislature had intended that the constitutional part of an act should stand regardless of the unconstitutional part there was a very simple way to accomplish that result, namely, by placing the usual clause prevalent in modern legislation to the effect that if any part of the law is declared to be unconstitutional, that its invalidity would not affect the remaining constitutional expression of the legislative will. The court stated in that opinion: "It would be pure conjecture on our part, equivalent to judicial legislating, to hold that the Legislature intended the provisions of this act to be separable." [188 La. 165, 175 So. 837]

 In Airey v. Tugwell, 197 La. 982, 991, 3 So.2d 99, 102, this Court stated: "The title of an act of the Legislature is of the nature of a label, the purpose of which is to give notice of the legislative intent and purpose to those interested in,

or who may be affected by, the terms of the act, and to prevent surprise and fraud upon members of the Legislature." In the title of Senate Bill No. 100 we find that it provides "for the payment of any judgment which may be rendered in said proposed suit." We think this is significant in arriving at the legislative intent. Since Senate Bill No. 100 authorizing suit against the state goes further and appropriates money to pay the judgment, which would have the effect of law, it is apparent that the Senate intended the bill in its entirety to be presented to the Governor for his approval. It does not appear reasonable that the legislature intended that this bill should be presented to the Governor for approval in part only. We can only conclude that the bill is not separable and therefore falls in its entirety.

For the reasons assigned, the judgment of the lower court is reversed and set aside, the plaintiff's suit is dismissed at his cost.

HAMITER, HAWTHORNE and TATE, JJ., dissent with written reasons.

HAMITER, Justice (dissenting).

Relied on by the majority herein is the well recognized principle that, "If the unconstitutional portions of an act are so interrelated and connected with the constitutional parts that they cannot be separated without destroying the intention manifested by the legislature in passing the act, the entire act is void." I am convinced that such principle is not applicable to this cause.

To my mind it is clear that in adopting the legislation under consideration the Legislature intended only to authorize this plaintiff to sue, and to litigate his claim against, the state pursuant to the provisions of Section 35, Article 3 of the Louisiana Constitution. The objectionable Section 4 thereof (assuming that it is invalid) was inserted, as an incidental matter, merely to set forth the manner in which any future judgment in plaintiff's favor might be paid. Surely in adopting that section there existed no intention of nullifying the other provisions of the legislation. And this being true it seems proper to conclude that the Legislature would have granted the authority to sue and litigate in the absence of the invalid Section 4. Therefore, in my opinion such section should be regarded as mere surplusage and wholly unnecessary for the accomplishing of the purpose the Legislature had in mind.

In keeping with this view are the following observations contained in Lewis v. State, 207 La. 194, 20 So.2d 917, 921:

"Statutes passed in furtherance of provisions of the character of those imposed by Section 35 of Article 3 of the Constitution are remedial in their nature and should be liberally construed. * * *

\* \* \* \* \* \*

"In the act itself the Legislature, speaking for the State, declared in no uncertain terms that it was willing for Miss Lewis to sue the State, and for the State to be sued and stand in judgment on the matter of her claim for the damages she alleged she sustained at the hands of the State's agents or employees in a state institution. It is inconceivable that in granting Miss Lewis the right to prosecute her action against the State the members of the Legislature intended to neutralize her right and to enact legislation that would be manifestly in contradiction of the constitutional provision and of no legal force or effect whatever. It is the duty of this Court, if it may do so consistently, to interpret a legislative act in a way that will uphold its constitutionality rather than to strike it with nullity. * * *"

I respectfully dissent.

HAWTHORNE, Justice (dissenting).

According to the majority opinion Section 4 of Senate Bill No. 100 is an appropriation, and for the reasons given in the opinion the majority conclude that the act in its entirety is unconstitutional because this section cannot be separated from the remaining portions of the bill.

As I view the matter, the main purpose and object of the bill was to waive sovereign immunity from suit in favor of Cobb, and this was the intention of the Legislature in adopting the bill. Consequently, assuming that Section 4 is an appropriation, I think it can be deleted from the bill even in the absence of a separability clause, leaving the remaining portions of the bill perfectly valid as carrying out the main purpose and object of the bill itself. One of the cases cited in the majority opinion, Calcasieu Long Leaf Lumber Co. v. Reid, 146 La. 77, 83 So. 384, is authority for this very proposition. The following extract from that case is quoted in the majority opinion:

"Of course, there are cases where a statute may be valid in one respect and invalid in another. *But they are cases where the two parts of the law are so distinct and separable that the court can conclude that the intention of the Legislature was that the valid provisions of the law should be enforced, without regard for the provisions declared invalid. * * *"* (Italics mine.) See also Womack v. Varnado, 204 La. 1019, 16 So.2d 825.

TATE, Justice (dissenting).

I respectfully dissent.

A fundamental rule of statutory construction is that a statute will be sustained when a constitutional construction can be given it as against an unconstitutional construction urged. Meyer v. Board, 199 La. 633, 6 So.2d 713; Williams v. Department of Highways, La.App. 1 Cir., 92 So.2d

98, certiorari denied. It is true that the statute presently construed *could* be interpreted as an appropriation act by considering Section 4 as mandatorily providing that any judgment rendered in favor of the claimant *"shall* be paid out of the revolving fund established pursuant to [LSA–]R.S. 51:692.9, or by the Treasurer of the State of Louisiana out of any funds belonging to the State not otherwise appropriated." If so, for the reasons stated in the majority opinion, such a statute would be clearly unconstitutional as an appropriation act.

However, the word "shall", although usually implying a mandatory duty, also is sometimes used to denote simple futurity.[1] Taken as used in the sense of simple futurity or permissiveness in the present statute, Section 4—complementing the scheme of the act which in Section 1 authorizes suit, Section 2 provides the place of such suit, and in Section 3 provides the delay within which such suit shall be instituted—simply indicates that *"if* judgment is rendered in favor of the claimant", it will or may be paid from the penitentiary revolving fund or from other funds of

the State. The act being presumed constitutional, I see no need to imply any legislative intent that such funds as "will" be paid, will be done other than in a constitutional manner; that is, after special appropriation by the legislature.

I might add that, as appellee indicates, Section 4 of the present act is an instance of the pro forma provision usually incorporated in authorization suits introduced to comply with Article III, Section 35, Louisiana Constitution, in the version thereof before the 1946 amendment, when it formerly provided: "Whenever the legislature shall authorize suit to be filed against the State, it shall provide a method of procedure and *the effect of the judgments which may be rendered therein."* (Italics mine.)

The interpretation presuming that the act in question is constitutional and was merely intended to be a legislative authorization of suit against the State and that it was not an unconstitutional act is substantiated by the circumstances of this case. These indicate, in my humble opinion, a specific intent that this act would be specifically an authorization to file suit against

---

1. Cf., Black's Law Dictionary (3rd Ed. 1933) p. 1616 (citations omitted):
 "Shall. As used in statutes, contracts, or the like, this word is *generally* imperative or mandatory. * * * But it *may* be construed as merely permissive or directory, (as equivalent to 'may,') to carry out the legislative intention and in cases where no right or benefit to any one depends on its being taken in the imperative sense, and where no public or private right is impaired by its interpretation in the other sense. * * * *Also, as against the government, it is to be construed as 'may,' unless a contrary intention is manifest.* * * *
 "Although the word usually denotes an obligation, it also implies an element of futurity. * * * (Italics mine.)

the State by compliance with Article III, Section 35, Louisiana Constitution, as amended.

Plaintiff-appellee's earlier suit upon this same cause of action was dismissed specifically because it had not been filed pursuant to legislative authorization to file suit against the State. 229 La. 1, 85 So.2d 10. Thereafter, the present Senate Bill No. 100 of 1956 was introduced on behalf of plaintiff and in due course passed by the Legislature, with the obvious purpose of enabling plaintiff to bring the present suit by waiving the State's immunity. If the present bill had been intended as an appropriation act, a constitutional requirement is that it be introduced in the State House of Representatives, and I daresay that not only plaintiff's learned counsel and every member of the legislature, but almost any informed citizen in this State is familiar with the rule that appropriation bills must be introduced in the lower house. This circumstance that the present authorization act was instead introduced in the upper house alone would, in my opinion, indicate an obvious intent that this bill be considered solely as an authorization to file suit against the State and not as an appropriation bill.

And although I think for the above reasons alone the majority opinion of my esteemed brethren falls into error, I am also inclined to believe that the Governor's veto, however effective it might be as to other portions of the act, would not affect a legislative authorization pursuant to Article III, Section 35, waiving the State's immunity from suit, such waiver not requiring the concurrence of the Governor. Lewis v. State, 207 La. 194, 20 So.2d 917, Jefferson Lake Sulphur Co. v. State, 213 La. 1, 34 So.2d 331.

For these reasons I do not concur in the majority opinion herein.

On Rehearing

SIMON, Justice.

The plaintiff sued the Louisiana Board of Institutions and the State of Louisiana under the authority conferred upon him by Senate Bill No. 100 of 1956. Plaintiff's suit is for the recovery of damages for the loss of twenty registered Aberdeen Angus breeding cows, which allegedly met their death by consuming a "sugared water" mixture, supposedly to be mill run blackstrap molasses, purchased from the Louisiana State Penitentiary, an agency under the jurisdiction of the Board of Institutions.

It may be observed that this is the second suit instituted by plaintiff against these defendants. The first suit involved the identical factual issues which are presented in the instant suit. Originally plaintiff sued the defendants, without first obtaining the consent and authority of the State in the manner provided by the Constitution,

on the professed conception that the State may be sued without its consent for a breach of contract when it is acting in a proprietary capacity. In support of this theory, plaintiff originally urged that the Louisiana State Penitentiary, having been authorized to sell its surplus farm products,[1] the proceeds therefrom to be deposited in a revolving fund,[2] it followed that the State was in the position of any other vendor and could be held liable for a breach of the warranty of fitness exacted by Articles 2475 and 2476 of the LSA–Civil Code. We refused to sustain this contention and held that since the consent of the Legislature for the institution of suit had not been obtained in the manner provided by Section 35 of Article 3 of the Constitution, as amended by Act 385 of 1946, adopted November 5, 1946, LSA, the courts were without jurisdiction to entertain it.[3]

Thereafter, at the next regular session of the Legislature in 1956, a bill was introduced in the Senate (Senate Bill No. 100), the title and parts of which are substantially as follows:

## "An Act

"To authorize Lloyd J. Cobb to file suit against the State of Louisiana through the Louisiana Board of Institutions upon a claim for damages arising from the death of his cattle alleged to have been caused by being fed material bought from the Louisiana Board of Institutions; to provide the method for citing the State therein, designating the Court in which said suit may be instituted; waiving any prescriptions which may have accrued in favor of the State against said claim and providing for the payment of any judgment which may be rendered in said proposed suit."

Section 1 contains authorization for the plaintiff to prosecute his suit in his claim against the State for damages suffered as the result of the death of his cattle; Section 2 refers to the court in which the suit may be filed and the manner in which the State shall be served and cited; Section 3 prescribes the filing of suit within six months after this Act becomes law and waives any prescriptions which may have accrued in favor of the State and against said claim; Section 4 provides for the mandatory payment of the judgment which might be rendered and the source from which payment shall be made.

This bill was adopted by the Legislature without amendment and presented to the Governor, and in due course was vetoed and returned by him to the Senate, from which it originated, with his written objections attached thereto. Upon its receipt the bill, upon motion of its author, was re-

1. LSA–R.S. 51:692.10.
2. LSA–R.S. 51:692.9.

3. Cobb v. Louisiana Board of Institutions, 229 La. 1, 85 So.2d 10.

turned to the Senate calendar, subject to call. This bill was never reconsidered or acted upon by the Senate in an effort to override the veto of the Governor, and the Legislature subsequently adjourned sine die.

Thereupon, plaintiff filed the instant suit with the same allegations as were made in the first suit with the exception that in the instant suit, after alleging the creation by the Legislature (LSA–R.S. 51:692.9) of a revolving fund of $500,000 to be used by the Louisiana State Penitentiary in the conduct of its general farming and agricultural operations, thereupon proceeded to pray for judgment in the amount sued for "and that the same be paid out of the revolving fund established by [LSA–]R.S. 51:692.9 or by the Treasurer of the State of Louisiana out of any funds belonging to the State, not otherwise appropriated."

The State and the Board of Institutions filed exceptions to the jurisdiction of the Court and that of no right and no cause of action, which were founded on constitutional governmental immunity from suit without valid legislative consent.

Faced with these exceptions, plaintiff thereupon filed a supplemental petition deleting that part of the prayer directing the manner in which the judgment shall be paid. The exceptions were overruled, and a judgment on the merits was again rendered in plaintiff's favor, with legal interest from February 1, 1954, until paid and all costs. The State and the Board of Institutions appealed from the adverse ruling.

On original hearing we reversed and set aside the judgment of the lower court and decreed that the bill relied upon as a waiver of immunity was constitutionally invalid. It is now before us on rehearing.

Pretermitting the justness of plaintiff's claim for damages, the question presented is whether there has been granted a legal and valid waiver of the right of the State to immunity from this suit. Under its exceptions the State and the Board contend that:

(1) By virtue of the title of the bill and the mandatory provisions of Section 4, supra, it was a bill designed and intended to have the effect of law, and which, under Article 5, Section 15, of the Constitution, must be presented to the Governor for his official action;

(2) That while in fact so presented it was vetoed, returned to the Senate, never called for reconsideration or the veto overridden, and consequently is ineffective and invalid.

On the other hand, plaintiff's contentions are:

(1) That the bill is not a law, nor must it be deemed as one having the effect of law within the meaning of the Constitution, hence the provisions of Paragraph 1 of Section 15 of Article 5 of the Constitution are not applicable;

(2) Not being a law or having the effect of law, the signature or approval of the Governor was not necessary to its validity;

(3) That the Governor's approval being unnecessary, his veto thereof and the absence of its reconsideration by the Senate was wholly ineffective, and that the bill as passed by the Legislature validly constitutes a full and complete grant of authority to the filing of this suit.

 Under our system of government it is fundamental that a state is immune from suit in its own as well as in any other courts, unless it has expressly consented to and waived its immunity. We will assume that the bare statement of this rudimentary tenet of law finds unquestioned acceptance. State ex rel. Hart v. Burke, 33 La.Ann. 498; Cobb v. Louisiana Board of Institutions, supra, and authorities therein cited and reviewed. And it is a necessary corollary that the consent to be sued is a matter of grace and is in no sense a vested right.

As regard suits against the State, the Legislature may impose such limitations and restrictions as it pleases *on the right of suit* which is authorized by Article 3, Section 35, of the Constitution, as amended by Act 385 of 1946, adopted November 5, 1946. This constitutional section specifically limits and circumscribes the method to be employed by the Legislature, in that, whenever it shall do so it shall: (1) provide the method for citing the State there-

in; (2) designate the Louisiana court or courts in which the suit or suits may be instituted; and (3) may waive any accrued prescription in favor of the State against the claim or claims on which the suit is so authorized. It is therein further declared that the procedure in such suits shall be the same as in suits between private litigants, but that *no judgment for money against the State shall be satisfied except out of moneys appropriated by the Legislature for the purpose.* (Italics ours.) It further provides that:

"Except as otherwise specially provided in this section, the effect of any *authorization* by the Legislature for a suit against the State *shall be nothing more than a waiver of the State's immunity from suit insofar as the suit so authorized is concerned.*" (Italics ours.)

 It is manifest that the foregoing provisions are limitations and restrictions, and though the Legislature in waiving its immunity may impose other conditions or additional restrictions, the latter cannot transcend or be inconsistent with the mandatory limitations therein prescribed.

It must be conceded that the constitutional article as amended, supra, does not contain any express reference making necessary any action, affirmative or otherwise, by the Governor. In recent cases we ex-

plicitly held that the Legislature alone, regardless of any action by the Governor, may grant such waiver of immunity. In Lewis v. State [4] the Legislature, by Act 273 of 1942, authorized the plaintiff to file suit against the State upon her claim for damages. After suit was filed the State questioned the jurisdiction of the court ratione personae and ratione materiae on the ground that the bill was unconstitutional in that it failed to provide the method of procedure required by Section 35 of Article 3 of the Constitution. The State contended that the act in question is:

"* * * a law within the meaning and contemplation of the constitutional provisions governing legislative enactments which * * * are intended to permanently direct and control matters applying to persons or things in general, instead of dealing as it does, with a matter of special or temporary character."

We said that:

"* * * Notwithstanding a legislative act authorizing a suit to be brought against the State is of a special character, this Court has held that the waiving of immunity or exemption from suit * * * and the authorization by the Legislature to a person to sue the State is not a special or local law * * *. It is simply a special act authorizing a person to sue, needing no notice to be given to authorize its enactment and being uncontrolled as to its own course."

We further said:

"Under the wording of Section 35 of Article 3 of the Constitution, the right is vested in the Legislature, and not in the Legislature with the approval of the Governor, to authorize the institution of a suit against the state. The constitutional provision reads in part: 'Whenever the *Legislature* shall authorize suit to be filed against the State * * *.' (Writer's italics.) The provision does not declare that the Legislature shall, by a law formally adopted, permit suit to be brought against the State, but merely that the Legislature shall authorize such a suit, without specifying the manner in which such authorization may be given. In other words, the Legislature may, without attempting to pass a general or special law pursuant to the constitutional provision, pass a joint resolution, which, although not effective as a law, is effective as a consent of the State to subject itself to suit. Under Section 17 of Article 5 of the Constitution of 1921, such a resolution when passed by the Legislature would become effective without the approval of the Governor."

4. 207 La. 194, 20 So.2d 917, 919.

In Jefferson Lake Sulphur Co. v. State, 213 La. 1, 34 So.2d 331, 336, we recognized plaintiff's right to file suit and that in the event of a favorable judgment, its enforcement would be *"subject to such action as may be taken by the Legislature and the Governor, if and when the legislation necessary to appropriate funds to pay such judgment shall be introduced."* (Italics ours.)

In the instant case it is observed that the title of Senate Bill No. 100 contains in part the clause: `"* * * and providing for the payment of any judgment which may be rendered in said proposed suit."` To avoid the title of the Act being broader than its provisions, after properly detailing in Sections 1, 2 and 3 the procedure called for by Section 35, Article 3 of the Constitution, Section 4 was inserted, and which reads:

"If judgment is rendered in favor of claimant and against the State of Louisiana, *it shall be paid* out of the revolving fund established pursuant to R.S. 51:629.9, or by the Treasurer of the State of Louisiana, out of any funds belonging to the State, not otherwise appropriated." (Italics ours.)

These provisions, in their very nature and effect, constitute a mandatory order for the payment of a judgment against the State from the revolving fund of the State Penitentiary or out of any funds belonging to the State "not otherwise appropriated." The use of the word "shall" must, under LSA–R.S. 1:3, be construed to be "mandatory" and not "permissive" in accord with its common approved usage.

It must be conceded that had the Legislature approved a bill in the nature of a joint resolution, in accord with Section 35 of Article 3, and had limited its provisions to Sections 1, 2 and 3, it would have been effective as a valid consent of the State to subject itself to suit without the approval of the Governor.

The obvious purpose of inserting Section 4 was not only an attempt to add to and to broaden the simple procedural method prescribed by Section 35 of Article 3, but was also an attempt to avoid the necessity of obtaining a subsequent appropriation from the Legislature, requiring the approval of the Governor, to pay any judgment which might have been obtained against the State. Being a component subdivision, Section 4 became an inseparable part of the whole act. Thus the bill lost its identity as a mere waiver of immunity from suit and became a legislative statute embracing one object with a title indicative of its object and clearly intended to have the force and effect of law.[5]

---

5. Section 16 of Article 3: "Every statute enacted by the Legislature shall embrace but one object, and shall have a title indicative of its object. * * *"

It is significant that the plaintiff so interpreted and construed the legal effect of Section 4 for in his original petition filed herein he alleged and prayed that judgment "be paid out of the revolving fund * * * or by the Treasurer of the State of Louisiana out of any funds belonging to the State, not otherwise appropriated."

 Were we to conclude that the bill in question is a valid waiver of immunity from suit, we would have to first hold that the Legislature had the constitutional right to provide by mandate in the title and the body of the bill or resolution authorizing suit, the manner in which the judgment would be paid and the particular fund or source of revenue upon which levy for payment shall be made. To so hold would fall within the prohibition contained in Article 3, Section 35 which, as aforestated, not only expressly limits and restricts the procedure to be observed in obtaining mere waiver of immunity, but which likewise provides that such an authorization shall be "nothing more than a waiver of the State's immunity from suit * * *," and under which our jurisprudence requires the enactment of an act by the Legislature, with the approval of the Governor, appropriating the necessary funds to pay whatever judgment must have been rendered.

Were we to hold that no constitutional objections to the bill, by virtue of the inclusion of Section 4, can be validly urged

under its explicit and mandatory language, it is manifest that plaintiff would be entitled to demand payment of his judgment out of the revolving fund of the penitentiary, and as aforestated, relieve him of the necessity of obtaining from the Legislature, at some future session, a specific appropriation for the payment thereof.

It is fundamental that every bill which is to have the force and effect of law must be passed by both Houses, and under Section 26 of Article 3 must be presented to the Governor. Upon its receipt, he is required by Section 15 of Article 5 to either: (1) Approve the bill as a whole as presented; (2) Allow the same to become law by failing to act upon it within the prescribed time limit; or (3) Veto the whole bill and return the same with his objections to the House in which it originated. It is further required that should the bill be vetoed both Houses must, by a two-thirds vote, override the veto before it can be effective as a law.

As previously observed, upon receipt of the bill with the attached veto message of the Governor, it was returned to the calendar on motion of its author, and was never thereafter called or presented for reconsideration during the remainder of the Legislative session. It neecssarily follows that being in an embryonic state, when the Legislature adjourned sine die, its potential legal force and effect perished.

Plaintiff contends that the conclusions reached by us in the Lewis case, supra [207 La. 194, 20 So.2d 919], are clearly analagous to and decisive of the case here. In that case the bill waiving immunity contained a subdivision (Section 4) authorizing and directing the State Treasurer to pay any judgment obtained by plaintiff, the payment to be made out of the General Fund or any other fund *especially appropriated to pay the claim.* The State urged the same objections as to the effect of such a provision as is here contended. We held that the Legislature, in granting a right to sue, had the unrestricted power to provide a method of procedure and the "effect of the judgment which may be rendered * * *."

We are in full accord with this holding. When the Lewis case, supra, was decided, January 15, 1945, Section 35 of Article 3 of the Constitution read as follows:

"Whenever the legislature shall authorize a suit to be filed against the State, it shall provide a method of procedure and *the effect of the judgments* which may be rendered therein." (Italics ours.)

This section was rewritten by the enactment of Act 385 of 1946, and adopted November 5, 1946. As rewritten the constitutional section spelled out in explicit language the simple procedure to be followed in obtaining a waiver of immunity, but struck out and omitted therefrom the clause providing for "the effect of the judgments which may be rendered therein." Hence, we were *fully justified* in upholding the validity of the bill waiving immunity in the light of the then existing constitutional provision granting to the Legislature the right of providing for the effect of judgment which might be rendered against the State. Such power no longer prevails nor is enjoyed by the Legislature by virtue of the amending Act No. 385 of 1946, approved by the electorate on November 6, 1946.

For these reasons and those set forth in our original opinion, it is ordered that that opinion and decree be reinstated as the final judgment in this case.

HAMITER, J., dissents, adhering to his previously assigned reasons.

HAWTHORNE and HAMLIN, JJ., dissent.